1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
SAMMY DANIELS,                    )    No. C 10-5230 LHK (PR)
11                                 )
            Petitioner,            )    ORDER DENYING PETITION FOR WRIT
12                                 )    OF HABEAS CORPUS; DENYING
    vs.                            )    CERTIFICATE OF APPEALABILITY
13                                 )
                                   )
14  MIKE MCDONALD, Warden,         )
                                   )
15          Respondent.            )
    _____ )
16

17        Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254.  The Court ordered Respondent to show cause why the petition

19  should not be granted.  Respondent has filed an answer addressing the merits of the petition.

20  Petitioner has filed a traverse.  Having reviewed the briefs and the underlying record, the Court

21  concludes that Petitioner is not entitled to relief based on the claims presented and denies the

22  petition.

23                      **PROCEDURAL HISTORY**

24        Petitioner was sentenced to twenty-eight years-to-life in state prison in Santa Clara

25  County Superior Court, after his conviction for kidnapping for rape, along with findings that

26  Petitioner had a prior conviction and served prior prison terms.  Petitioner filed a direct appeal to

27  the California Court of Appeal, which affirmed the conviction and judgment.  He petitioned the

28  state appellate court for a rehearing which was denied.  The California Supreme Court denied

review.  Petitioner filed a petition for writ of habeas corpus in the state high court, which denied

review.  Petitioner filed the instant federal habeas petition on November 18, 2010.

# BACKGROUND[1]

## I. Factual Background

On Saturday, August 27, 2005, 21-year-old S.D. (S.) spent the evening with her friend J. H. (J.) and J.'s older sister T. H. (T.). The three women socialized at T. and J.'s parents' house for a while, and S. and J. each drank a number of shots of vodka or rum. [FN1] Then, T. drove the three women to downtown Palo Alto so that they could go "bar hopping." The first bar they visited was Old Pro, where S. had one or more "Jager bombs" and shared a mixed drink with a male friend she encountered. [FN2] After spending half an hour at Old Pro, they proceeded to Nola's, which was next door to Old Pro. At Nola's, S. had a few more "Jager bombs." Their next destination was a bar called Fanny & Alexanders's. T. had a dispute with the bouncer over payment of the cover charge. Defendant, a 51-year-old man who was standing nearby, offered to pay the cover charge for the three women, and they accepted the offer.

FN1. S., who was five feet, five inches tall and weighed about 135 pounds, may have consumed as many as 10 shots at the house.

FN2. A "Jager bomb" is a mixture of Jagermeister liquor and Red Bull.

The women went inside the bar and immediately went to the bathroom, as S. was feeling sick. Her indisposition was due to the fact that she had consumed "probably around 13 shots" of alcohol over a period of three to four hours. [FN3] S. vomited in the toilet while they were in the bathroom. They came out of the bathroom and briefly socialized with some men they knew. It was near closing time when they arrived at Fanny & Alexander's, and they left the bar at closing time, which was 2:00 a.m. At this point, both S. and J. were intoxicated, but were walking and talking normally.

FN3. S. testified that this was a "pretty normal amount" of alcohol for her to consume.

Once they exited Fanny & Alexander's, S. left J. and T. and ran across the street into a parking lot to vomit. J. lost sight of her. When S. did not return within a couple of minutes, J. ran across the street and looked for her, but she could not find her. T. and J. tried calling S. on her cell phone numerous times, but there was no answer. T. and J. walked around looking for S. for another 10 to 15 minutes, but did not find her. They finally assumed she had found a ride with another friend, and they went home.

---

[1] The facts of this case are taken from the California Court of Appeal opinion in *People v. Daniels*, No. H032497 (Cal. App. 6 Dist. Aug. 4, 2009).  (Pet. Ex. A ("Op").)

S. had gone into an alley on the side of the parking lot across the street from Fanny & Alexander's. She lost consciousness, and the next thing she remembered was waking up to find herself lying on the ground in the alley. She heard her cell phone ringing "a lot of times," but "I just could only, like lie there and throw up, really." S. heard defendant's voice talking to her as she was lying on the ground face down. Defendant asked her if she was "okay." She did not respond. Since her phone had stopped ringing, S. thought that perhaps defendant had answered it and was going to bring her to her friends. S. continued to throw up "and then somehow I ended up in a car." S. thought defendant had driven up to where she was lying. She had no recollection as to how she got in the car, and she had not agreed to get in the car. [FN4]

> FN4. At trial, on cross-examination, S. acknowledged that she had told the police that she "got into the car with him because he said, "Oh, your friends want me to take you to them.'"

S. vomited out the window of the car. S. continued to alternate between a state of unconsciousness and a state of being "out of it." "I was, like, in and out of being passed out and throwing up, wake up only to throw up and then passing out again." She noticed that the car was moving. At one point, when S. was vomiting out the car window, she noticed that the car was at a gas station. She "couldn't physically get out" of the car because she was unable to "move or talk." S. felt someone touching her "[u]nder my shirt on my breasts." She was "pretty sure" that her "skin" was being touched. [FN5] S. did not know whose hands were touching her, but she was "pretty sure" that this person was in the car with her. S. was "scared" and did not know what to do. She fell back to sleep.

> FN5. At trial, on cross-examination, S. testified that she could "barely recall" the breast touching and it was "kind of like a flashback." She "didn't remember it at first, and then I remembered it after."

Defendant, who lived in an apartment in Hayward and worked in Mountain View, arrived at the Super 8 Motel in Hayward between 2:00 and 3:00 a.m. Hayward is 20 miles from downtown Palo Alto, a distance that takes about 30 to 45 minutes to drive in the absence of traffic. Defendant's Hayward apartment was about a mile and a half from the Super 8 Motel. Defendant entered the motel office and filled out a registration card, and the motel clerk wrote down defendant's driver license number on the card. Defendant signed the card with his Muslim name "Ali Bilal." Defendant told the clerk that the room was for him and his wife.

The next thing S. remembered after falling back to sleep in the car was "being carried somewhere and then laid down on the bed in a hotel room." S. kept her eyes closed because she was "scared and I didn't know what to do." She heard defendant say "I'll be right back" and leave the motel room. As soon as he left the room, S. opened her eyes. Suddenly, she felt able to move and speak again. S. "totally freaked out and got up and ran out of the room." At some point, S. had lost both her purse and her shoes. [FN6] She ran into the motel's parking lot and approached two young male strangers.

> FN6. She had taken her shoes off when she came out of Fanny & Alexander's and was carrying them because they hurt her feet.

James Elder and Gary Casupang, young men in their mid-20s, had checked into the Super 8 Motel in Hayward between 2:00 a.m. and 3:00 a.m. on August 28, 2005. As they were parking their car, they saw a large maroon car parking nearby. A few minutes after arriving at their room, they went back out to their car to turn off the car's interior light. As they approached their car, they heard a woman's voice behind them yelling repeatedly "Help." Elder looked around and saw S. running toward them from the motel building. She looked "scared" and "traumatized." Elder and Casupang had never seen S. before.

S. was breathing heavily and seemed "quite hysterical." Elder saw defendant "running behind her and chasing her." S. reached them, "latched herself onto" Casupang's arm, and told Casupang "I've been kidnapped." She asked them to help her, and Elder and Casupang agreed to do so. They took her to their car. Defendant stopped chasing her, "backed off a bit[,]" and "lingered" near a maroon car by the motel building. He crouched down and watched them.

Elder, Casupang and S. got into their car and drove away. Elder and Casupang told S. that they were "[n]ear Oakland," and S. was "horrified." S. did not seem intoxicated. S. asked Elder and Casupang to take her to Palo Alto. She told them that she had gone out to a bar in Palo Alto with some friends. She said she was kidnapped when she went outside the bar to use her phone. S. said that the man had kidnapped her and tried to sexually assault her. She provided no details.

Ten minutes after checking into the Super 8 Motel, defendant returned to the motel clerk, said "My wife disappeared," and asked the clerk for refund. Because this was within the motel's "grace period[,]" the clerk returned defendant's money to him. The clerk suggested that defendant call 911, but defendant said "there is no need." Defendant scratched out his driver's license number on the registration card and left. The clerk saw defendant drive away in a maroon car.

Elder and Casupang took S. back to Palo Alto. S. went to the Palo Alto police department with her mother at about 6:00 a.m. S. was interviewed by two police officers. The one hour interview was interrupted four or five times for S. to go to the bathroom due to her nausea. S. did not seem intoxicated.

On the morning of August 30, 2005, defendant brought S.'s purse to the Palo Alto post office. He told the postal clerk that he had found the purse in the parking lot. The clerk told defendant that they had a lost and found and would try to return the purse to its rightful owner. The post office noticed S., and she retrieved her purse. S.'s cell phone, wallet, identification, credit cards, money, and keys were in the purse along with a small spiral notebook. S. noticed that a note had been written inside her notebook.

This note, which had been written by defendant, read: "S[.], sorry about that night. You were so drunk, you couldn't tell me or show me where you lived, so I paid for a motel as a safe haven for you. You disappeared on me. I guess you were in fear. I wasn't gonna hurt or harm you or violate you. You are so pretty. I hope you learned a lesson. You should never drink again. [¶] What had I been a seria [sic] killer or a rapist? You could have been killed or raped. This should be a serious lesson for you. I wish I could see you before you're off to school. You're such a beautiful woman; so fine. Excuse me. I wish you success in your endeavors. Study Islam and the history the Koran. [¶] Your

success is in the religion of Islam Sunni Muslim. You take care of your soul, baby girl. Allah bless your stranger."

Defendant was eventually identified by his driver's license number from the motel registration card. He was arrested on November 21, 2005. He was driving a maroon four-door 1996 Plymouth. S.'s DNA was found in the front passenger area of the Plymouth. A document in the Plymouth identified defendant as "Brother Bilal." Defendant had been convicted of a 1990 Palo Alto rape.

## II. Procedural Background

Defendant was charged by information with kidnapping for rape (Pen. Code, § 209, subd. (b)(1)), kidnapping (Pen. Code, § 207, subd. (a)), and sexual battery (Pen. Code, §§ 242, 243.4, subd. (a)). It was further alleged that he had suffered seven prior strike convictions (Pen. Code, §§ 667, subds. (b)-(i), 1170.12) and three prior serious felony convictions (Pen. Code, [§] 67, subd. (a)), and had served prison terms for two prior violent felony convictions (Pen. Code, § 667.5, subd. (a)).

The prior conviction and prison prior allegations were bifurcated. Defendant expressly conceded identity at trial. Evidence of defendant's 1990 rape offense was admitted at trial over defendant's objection. The parties agreed that the simple kidnapping count was charged only as a lesser included offense of the kidnapping for rape count, and the jury was instructed accordingly.

The jury deliberated for one full day before reaching its verdicts. It found defendant guilty of kidnapping for rape and acquitted him of the sexual battery count. [FN7] The jury and the court made true findings on the prior conviction and prison prior allegations. Defendant was committed to state prison to serve an indeterminate term of 28 years to life consecutive to a determinate term of 21 years. He was also ordered to pay a court security fee of $40. Defendant filed a timely notice of appeal.

FN7. The jury reached no verdict on the simple kidnapping count as it had been instructed not to return a verdict on that count if it convicted defendant of the kidnapping for rape count. The jury had been instructed that the sexual battery count required proof that "defendant unlawfully restrained" S. and that the touching occurred "while [S.] was restrained."

(Op. at 2-7.)

## DISCUSSION

A.   <u>Standard of Review</u>

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

1  may not grant a petition challenging a state conviction or sentence on the basis of a claim that

2  was reviewed on the merits in state court unless the state court's adjudication of the claim

3  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

4  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

5  resulted in a decision that was based on an unreasonable determination of the facts in light of the

6  evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).   The first prong applies

7  both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S.

8  362, 384-86 (2000), while the second prong applies to decisions based on factual determinations,

9  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

10       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

11  court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

12  law or if the state court decides a case differently than [the] Court has on a set of materially

13  indistinguishable facts." *Williams*, 529 U.S. at 412-13.  A state court decision is an

14  "unreasonable application of" Supreme Court authority, falling under the second clause of

15  § 2254(d)(1), if the state court correctly identifies the governing legal principle from the

16  Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

17  case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because

18  that court concludes in its independent judgment that the relevant state-court decision applied

19  clearly established federal law erroneously or incorrectly." *Id.* at 411.

20       In determining whether the state court's decision is contrary to, or involved an

21  unreasonable application of, clearly established federal law, a federal court looks to the decision

22  of the highest state court to address the merits of a Petitioner's claim in a reasoned decision.

23  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here, that decision is the opinion of

24  the California Court of Appeal.

25  B.       Petitioner's Claims

26       Petitioner claims the following as grounds for federal habeas relief: (1)  he received

27  ineffective assistance of trial counsel; (2) the trial court erred in refusing to allow the defense

28  expert to testify, in violation of Petitioner's right to present a defense ; (3) there was insufficient

1  evidence to convict him of kidnapping to commit rape; and (4) the jury instruction on

2  kidnapping did not comport with due process.

3         1.    Ineffective Assistance of Counsel

4       Petitioner's first claim is that his counsel rendered ineffective assistance by failing to

5  argue for the admissibility of Dr. Breithaupt's expert testimony on all possible grounds,

6  including Petitioner's right to present a defense, and that the omission precluded Petitioner from

7  seeking review of his claims in state court.  The state high court summarily denied this claim.

8       In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner

9  must establish two things.  First, he must establish that counsel's performance was deficient, *i.e.*,

10  that it fell below an "objective standard of reasonableness" under prevailing professional norms.

11  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was

12  prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that,

13  but for counsel's unprofessional errors, the result of the proceeding would have been different."

14  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the

15  outcome.  *Id.*  A court need not determine whether counsel's performance was deficient if the

16  lack of prejudice is clear.  *Id.* at 697.

17       The *Strickland* framework for analyzing ineffective assistance of counsel claims is

18  considered to be "clearly established Federal law, as determined by the Supreme Court of the

19  United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Cullen v. Pinholster*, 131 S.

20  Ct. 1388, 1403 (2011).  On federal habeas, a petitioner must show that the state court applied

21  *Strickland* to the facts of his case in an objectively unreasonable manner.  *Yarborough v. Gentry*,

22  540 U.S. 1, 5 (2003) (per curiam).  A "doubly" deferential judicial review is appropriate in

23  analyzing ineffective assistance of counsel claims under § 2254.  *See Pinholster*, 131 S. Ct. at

24  1410-11; *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (same); *Premo v. Moore*, 131 S. Ct.

25  733, 740 (2011) (same).  The general rule of *Strickland*, *i.e.*, to review a defense counsel's

26  effectiveness with great deference, gives the state courts greater leeway in reasonably applying

27  that rule, which in turn "translates to a narrower range of decisions that are objectively

28  unreasonable under AEDPA."  *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing

1  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is

2  not whether counsel's actions were reasonable.  The question is whether there is any reasonable

3  argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

4      The Court of Appeal summarized what happened at the hearing on the admissibility of

5  the defense's proposed expert testimony on alcoholic blackouts or alcohol's effect on memory.

6         The prosecution requested an Evidence Code section 402 hearing on the
   admissibility of expert testimony by proposed defense expert David Breithaupt.

7  The defense wished to have Breithaupt testify as an expert on alcoholic
   blackouts or an expert on alcohol's effects on memory.

8

9         Breithaupt testified at the Evidence Code section 402 hearing that he
   was a former physician who had specialized in endocrinology, metabolic
   disorder, and "indicative disorder." He had relinquished his medical license in

10  2004. Breithapt had worked in drug and alcoholism treatment. He had
   previously testified as an expert on alcoholism three times. Once, he had

11  testified regarding the effect of alcoholism on the human body in a murder case.
   Breithaupt had never testified in court about alcoholic blackouts. He based his

12  expertise on his personal experiences with addicts.

13         Breithaupt described what he called a "blackout" as a kind of alcohol
   intoxication-induced amnesia. This type of blackout was a symptom of

14  alcoholism. Breithaupt defined this type of "amnesia" as "a permanent inability
   to recall events during a specific interval." Breithaupt testified that a person

15  who had consumed a lot of alcohol and suffered a blackout could have a
   conversation during the blackout that the person would not remember

16  afterwards due to his or her alcohol consumption. Breithaupt asserts that a
   "serious spree drinker with high tolerance will have blackouts." He maintained

17  that a person who had a blackout might "fill in the gaps" in his or her memory
   "with confabulation."

18

19         Breithaupt was asked how he would diagnose blackouts. He responded:
   "Amnesic disorder could be diagnosed if a person is drinking; acknowledge loss

20  of memory; thirdly, gives you evidence of lying or confabulating to cover a gap
   in time that you are aware of [from] some other source; it would be – you would

21  obtain a past history of similar event, generally speaking. That's four; and five,
   some evidence that during the amnesic disorder, the person was, quote, able to
   function, end quote, function up to their standard."

22

23         Defendant's trial counsel argued that Breithaupt's proposed testimony
   was relevant because there was evidence that S. had blacked out, as she could

24  not remember how she and her friends got from one bar to another and gave
   inconsistent testimony about the events. Defendant's trial counsel contended

25  that it was important to educate the jury about the difference between "pass[ing]
   out" and having a "blackout." The prosecutor questioned Breithaupt's expertise

26  regarding blackouts, and he maintained that alcohol's effect on memory was
   commonly understood and therefore was not a proper subject for expert

27  testimony. The prosecutor also argued that such expert testimony would be
   relevant only if defendant was going to testify. Finally, he argued that
   Breithaupt's testimony should be barred under Evidence Code section 352 as

28  speculative, confusing, and misleading. The prosecutor claimed that the

admission of Breithaupt's testimony would be unduly time consuming because he would have to "call rebuttal witnesses and go into his qualifications and extensively cross-examine him." He asserted that this testimony would not be probative because S.'s recollections were inconsistent with her having been in an alcoholic blackout.

The court considered whether Breithaupt had the necessary qualifications to testify and whether his testimony would be relevant to the issues in the case. The court made a "tentative ruling" excluding Breithaupt's proposed testimony, but it noted that its ruling "could change, depending on what occurs during the trial…." The court provided two reasons for its tentative ruling. First, the proposed testimony would be "speculative" as there was insufficient evidence that S. had actually suffered a blackout. Second, Breithaupt's testimony was "quite confusing" and would "mislead the jury and be an undue consumption of time."

Defendant's trial counsel renewed her request that Breithaupt be permitted to testify after the trial court ruled that the 1990 rape was admissible under Evidence Code sections 1108 and 1101, subdivision (b). The court did not rule on this request, and the defense did not seek a ruling.

S. testified at trial that "I actually don't remember how I got into the car." She also testified that there were times that night "where [she] was doing things and can't remember." "Like, for example, I'm pretty sure we walked to [Fanny & Alexander's] from Nola's, and I don't remember doing that." She agreed that "that block of time is missing." The following colloquy occurred on cross-examination: Q. [by defendant's trial counsel] Did you know who you were talking to and who you were with at all times? [P] A. No. [P] Q. Do you remember where you were in the alley? [P] A. Not really." However, S. testified unequivocally that she was "pretty much positive" that she had never spoken to defendant. She also denied that she had "nodded or pointed" in response to anything he said.

After the prosecution rested, defendant's trial counsel renewed her motion to admit Breithaupt's testimony "for the purpose of alcohol on memory and also for blackouts." The prosecutor argued that there was no basis for the admission of such evidence. "[T]here is no gap. There is no period of time that anybody has testified to where she's conscious, she's doing things, and she testifies that she doesn't remember." The court decided that there was no basis to change its ruling. After the defense had presented its case, defendant's trial counsel decided not to renew her request to admit Breithaupt's testimony.

In her argument to the jury, defendant's trial counsel suggested that "[t]here were some blocks of time [S.] didn't remember where she knew she was doing things." She argued that S. might have been "awake" "between being in the alley and getting in the car" but "has no memory of it." "So we don't know whether or not it's an alcoholic blackout type situation or whether or not she really didn't remember because she had too much to drink."

(Op. at 16-19.)

Applying the "doubly" deferential standard of review to this claim under § 2254, this Court cannot conclude that the state court unreasonably applied *Strickland* in rejecting this

claim.  The record clearly shows that counsel was a diligent advocate in urging that the proposed expert testimony be admitted into evidence in the § 402 hearing, and then renewing her request twice thereafter.  *See supra* at 9.  When the evidence did not show conclusively that S. was in a blackout, trial counsel argued that S. could have been in a blackout, which would have made the expert testimony helpful to the jury.  *Id.*  However, the trial court found that the argument was nonetheless speculative and denied the motion.  *Id.*  After the prosecution rested, trial counsel renewed the motion to admit Breithaupt's testimony "for the purpose of alcohol on memory and also for blackouts."  *Id.*  Again the trial court found no basis to change its ruling and denied the motion.  Trial counsel also states in her declaration in support of Petitioner's habeas petition before the California Supreme Court that her arguments before the trial court to admit Breithaupt's testimony "implicitly and explicitly went directly to [Petitioner's] right to present a defense" and that "the issue was vigorously argued and the defense clearly attempted to exercise [Petitioner's] right to call witnesses by seeking leave to call the witness, which was denied twice by the trial court."  *See* Ans., Ex. J, ex. B at ¶ 5, 6.  Based on trial counsel's diligent effort in arguing for Breithaupt's testimony to be admitted into evidence at the § 402 hearing and her repeated motions thereafter, the Court finds that counsel's performance was not deficient.

Petitioner argues that trial counsel nevertheless rendered ineffective assistance for not raising the motion specifically on constitutional grounds, *i.e.*, that to exclude the evidence would violate Petitioner's right to present a defense.  The burden is on Petitioner to show that counsel's actions resulted in prejudice, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*  In order to show prejudice, Petitioner has to show that there is a reasonable probability that had trial counsel made the motion on constitutional grounds, (1) the trial court would have admitted Breithaupt's testimony, and (2) the testimony would have changed the jury's verdict.

The Court of Appeal found that the trial court did not abuse its discretion in excluding the expert testimony.

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "'Exclusion of evidence as more prejudicial, confusing or distracting than probative, under Evidence Code section 352, is reviewed for abuse of discretion.' [Citation.] But 'exclusion of evidence that produces only speculative inferences is not an abuse of discretion.'" (*People v. Cornwell* (2005) 37 Cal.4th 50, 81, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The trial court concluded that Breithaupt's testimony would have little probative value, since it was mere speculation that S. had suffered a blackout while in defendant's presence. It further found that Breithaupt's lengthy and "quite confusing" testimony was likely to mislead the jury.

The trial court's conclusion that the proposed testimony would have little probative value is well supported by the record. The defense's theory of relevance for Breithaupt's proposed testimony about alcoholic blackouts depended on two layers of speculation. The defense argued that it was *possible* that S. had agreed to accompany defendant in his car to the Hayward motel but did not remember doing so because she *might have been* experiencing an alcoholic blackout at that time. The evidentiary void consisted of the absence of evidence that S. was actually experiencing an alcoholic blackout when defendant encountered her in the alley and the absence of evidence that S. had agreed to accompany defendant. [FN11] S. did not testify that she was experiencing an alcoholic blackout at any point during her contact with defendant. While there was evidence that S. was highly intoxicated at the time defendant encountered her in the alley, she testified that she was not able to move or speak, except to vomit, and was drifting in and out of consciousness throughout the period when she was in defendant's presence. She testified unequivocally that she had neither said nor done anything to indicate that she agreed to accompany defendant. Defendant did not testify, and there was no evidence, other than S.'s testimony, regarding S.'s conduct or condition during her encounter with defendant.

> FN11. While the trial court made its tentative ruling prior to S.'s testimony, it subsequently affirmed its ruling after the completion of the prosecution's case, when defendant's trial counsel renewed her request for admission of Breithaupt's testimony. Consequently, it is appropriate for us to consider the trial testimony in analyzing the validity of the trial court's ruling.

The record also provides substantial support for the trial court's finding that Breithaupt's proposed testimony would be unduly time consuming, confusing, and misleading to the jury. Breithaupt's testimony at the Evidence Code section 402 hearing was quite time consuming, and it was evident that, had he been permitted to testify, the prosecutor would have been compelled to present more time-consuming expert testimony to rebut Breithaupt's testimony. The fact that even the trial court found Breithaupt's testimony "quite confusing" indicated that his testimony was unlikely to "assist the trier of fact." (Evid. Code, § 801, subd. (a) [expert opinion testimony limited to that which would assist the trier of fact].)

Our review of the record confirms the trial court's depiction of the confusing

nature of Breithaupt's testimony. Breithaupt described alcoholic blackouts as a symptom of alcoholism, and he attempted to describe how he would "diagnos[e]" an alcoholic blackout. He explained that a diagnosis of alcoholic blackout depended on the individual in question "acknowledg[ing] loss of memory" and the existence of "evidence that during the amnesic disorder, the person was, quote, able to function, end quote, function up to their standard." This testimony was confusing because it assumed that a person who had no memory of an event would know that they had no memory of that event and could acknowledge that loss of memory. That would be true only if there was other evidence that the event had occurred. Here, there was no evidence that S. had acknowledged a loss of memory during her encounter with defendant, no evidence that she had done anything to indicate that she was willing to accompany defendant, and no evidence that S. was "function[ing]" except to vomit during her encounter with defendant.

[¶]...[¶]

The trial court could rationally conclude that the extremely minimal probative value of Breithaupt's proposed testimony was substantially outweighed by the likelihood that it would be unduly time consuming and would confuse the jury. (Evid. Code, § 352.) Hence, it did not abuse its discretion in excluding Breithaupt's proposed testimony.

(Op. at 19-24.)

As discussed by the state appellate court, the trial court conducted a lengthy § 402 hearing on the admissibility of the proposed expert testimony during which it was required to balance the probative nature of the testimony against the possible prejudice, confusion, and consumption of time under California Evidence Code § 352. *See supra* at 8-9. The trial court then made a tentative ruling not to admit the evidence at that time, finding that Breithaupt's testimony was "quite confusing," speculative with respect to whether S. suffered a blackout in the absence of other supporting evidence, would confuse and mislead the jury, and be an undue consumption of time. Ans., Ex. B at 313-15. The trial court reaffirmed its ruling at the conclusion of the prosecution's case. *Id.* at 1973-74. Based on this record, it is not likely that the trial court would have changed its ruling had the motion been based on Petitioner's right to present a defense. The Court is not persuaded that the trial court would have considered the proffered testimony in a different light had such a motion been made. Rather, the trial court's weighing of the evidence under § 352 would not have been different: the probative value of the testimony towards Petitioner's defense was "extremely minimal" as there was no evidence to support his argument that S. suffered a blackout. *Id.* Furthermore, such a motion would not

1   have changed the trial court's conclusion that the testimony was confusing and misleading, and

2   that it was based on "just speculation."  Ans., Ex. B at 313-15.  Accordingly, Petitioner fails to

3   show that there is a reasonable probability that the trial court would have admitted Breithaupt's

4   testimony had counsel made the motion on constitutional grounds.

5       The Court of Appeal concluded that even if the trial court had erred in excluding the

6   expert testimony, the error was harmless.

7           Furthermore, even if we were to conclude that the trial court erred in
    excluding Breithaupt's proposed testimony, we would conclude that the error
8           was harmless. "No judgment shall be set aside, or new trial granted, in any
    cause, on the ground... of the improper admission or rejection of evidence...
9           unless, after an examination of the entire cause, including the evidence, the court
    shall be of the opinion that the error complained of had resulted in a miscarriage
10          of justice." (Cal. Const., art. VI, § 13.) As we have discussed above, Breithaupt's
    proposed testimony had minimal probative value. Any probative value that it had
11          depended on the jury's rejecting S.'s testimony that she was unable to move or
    speak when she was in the alley, and, despite the absence of any evidence,
12          speculating that she had actually indicated to defendant, a stranger, that she
    wished to accompany him in his car in the middle of the night. Breithaupt's
13          proposed testimony provided no rational basis for making such inferential leaps.
    The evidence presented to the jury in this case very strongly supported the
14          prosecution's case. We are confident that no rational juror would have
    disregarded the prosecution's strong case and instead opted to make the
15          speculative inferential leaps that would have been necessary to apply
    Breithaupt's confusing proposed testimony. On this record, it is not reasonably
16          probable that the results of the trial would have been different if Breithaupt had
    been permitted to give his proposed testimony. (*People v. Watson* (1956) 46
17          Cal.2d 818, 836.)

18
    (Op. at 24.)
19
        Petitioner also fails to show that there is a reasonable probability that the expert
20
    testimony would have changed the jury's verdict had it not been excluded.  As discussed by the
21
    state appellate court, the minimal probative value of Breithaupt's testimony made it unlikely that
22
    the jury would reject S.'s testimony that she was unable to move or speak in the alley and accept
23
    the otherwise unsupported speculation that S. actually accepted a stranger's invitation to his car
24
    in the middle of the night.  Rather, the evidence strongly supports the prosecution's case while
25
    Breithaupt's testimony would have required the jury to make "inferential leaps" which were not
26
    supported by any evidence.  The state appellate court was not unreasonable in concluding that it
27
    was not reasonably probable that the results of the trial would have been different had the jury
28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
Daniels5230hcden.hhl.wpd                                    13

1    heard Breithaupt's testimony.

2           For the foregoing reasons, counsel's performance was not deficient, and even if she erred

3    in failing to raise Petitioner's right to present a defense as grounds for the admission of

4    Breithaupt's testimony, Petitioner was not prejudiced because the result of the proceeding would

5    not have been different.  Accordingly, the state courts did not unreasonably determine that

6    counsel satisfied *Strickland*'s deferential standard.  *See Harrington*, 131 S. Ct. at 788.  Petitioner

7    is not entitled to habeas relief on this claim.

8           2.    Right to Present a Defense

9           Petitioner's second claim is that the trial court violated his right to present a defense

10   when it denied defense counsel's motion to admit expert testimony.  Respondent argues that

11   Petitioner is procedurally barred from raising this claim in federal court because the California

12   Court of Appeal found he had waived this constitutional claim by failing to challenge it at trial.

13          The Court of Appeal stated its reasoning as follows:

14               [Defendant] also claims that the trial court violated his constitutional
             rights by excluding this testimony. The Attorney General asserts that defendant
15           waived his constitutional contention by failing to raise it below. Defendant
             concedes that he did not raise his constitutional contention below, but he
16           nevertheless urges us to consider it. The cases he cites in support of his request
             that we consider this issue did not involve a claim that evidence was
17           erroneously admitted or excluded. An appellate contention that the erroneous
             admission or exclusion of evidence violated a constitutional right is not
18           preserved in the absence of an objection on that ground below. (Evid. Code, §§
             353, 354; *People v. Mattson* (1990) 50 Cal.3d 826, 853-854.) By failing to
19           object below, defendant forfeited his claim that the exclusion of this evidence
             violated his constitutional rights, and we will not consider this claim.

20

21   (Op. at 19, fn. 10.)

22          A federal court will not review questions of federal law decided by a state court if the

23   decision also rests on a state law ground that is independent of the federal question and adequate

24   to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  In the context of

25   direct review by the United States Supreme Court, the "adequate and independent state ground"

26   doctrine goes to jurisdiction; in federal habeas cases, in whatever court, it is a matter of comity

27   and federalism.  *Id.*  The procedural default rule is a specific instance of the more general

28   "adequate and independent state grounds" doctrine.  *Wells v. Maass*, 28 F.3d 1005, 1008 (9th

1    Cir. 1994).

2          It is undisputed that Petitioner failed to raise this claim at trial, which bars this Court

3    from reviewing the claim.  The Ninth Circuit has recognized and applied the California

4    contemporaneous objection rule in affirming denial of a federal petition on grounds of

5    procedural default where there was a complete failure to object at trial.  *See Inthavong v.*

6    *Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005) (holding petitioner barred from challenging

7    admission of evidence for failure to object at trial); *Paulino v. Castro*, 371 F.3d 1083, 1092-93

8    (9th Cir. 2004) (holding petitioner barred from challenging jury instruction for failure to object

9    at trial); *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999) (holding petitioner barred from

10   challenging denial of peremptory challenges for failure to contemporaneously object).  Petitioner

11   conceded to the state appellate court that he did not raise the constitutional claim at trial. *See*

12   *supra* at 14.  This claim is procedurally defaulted, and because Petitioner has not shown cause

13   and prejudice or a miscarriage of justice, *see Coleman*, 501 U.S. at 750, it is barred.

14         Even if the claim was not procedurally barred, it would not merit federal habeas relief.

15   The constitutional right to present a complete defense includes the right to present evidence,

16   including the testimony of witnesses.  *Jackson v. Nevada*, No. 09-17239, slip op. 8657, 8665 (9th

17   Cir. Aug. 6, 2012).  But the right is only implicated "when the evidence the defendant seeks to

18   admit is 'relevant and material, and . . . vital to the defense.'"  *Id.* (quoting *Washington v. Texas*,

19   388 U.S. 14, 16 (1967)).  Additionally, a violation of the right to present a defense does not

20   occur any time such evidence is excluded, "but rather only when its exclusion is 'arbitrary or

21   disproportionate to the purposes [the exclusionary rule applied is] designed to serve.'"  *Id.*

22   (quoting *Holmes*, 547 U.S. at 324).

23         To determine whether the excluded evidence is relevant and material, and vital to the

24   defense, the court may consider the following factors: (1) the probative value of the excluded

25   evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier

26   of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it

27   constitutes a major part of the attempted defense.  *See  United States v. Stever*, 603 F.3d 747,

28   755-56 (9th Cir. 2010) (quoting *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).

As discussed in the previous section involving Petitioner's ineffective assistance of counsel claim, the excluded expert testimony was not relevant or material: (1) the probative value was "extremely minimal," (Op. at 24); (2) its reliability was questionable as the expert had never previously testified as an expert about alcoholic blackouts, Ans., Ex. B at 254, 257; and (3) the testimony was confusing and likely to mislead the jury. *See supra* at 10-13. Factors showing that the evidence was vital to the defense are that (1) it was the sole evidence on Petitioner's proposed theory that S. had suffered a blackout, and (2) it constituted a major part of his defense that S. consented to going in Petitioner's car. Considering that the proposed defense relied heavily on speculation and the jury ignoring other evidence to the contrary, this Court is not convinced that the exclusion of this evidence was either "arbitrary or disproportionate" to the purposes its exclusion was designed to serve. *Jackson*, No. 09-17239, slip op. at 8665.

Furthermore, a violation of the right to present a defense merits habeas relief only if the error was likely to have had a substantial and injurious effect on the verdict. *Jackson*, slip op. at 8679 (citing *Brecht v. Abrahamson*, 507 U.S. 619 (1993)). This Court has already determined that any error in counsel's performance by failing to raise an objection to the exclusion of the evidence on constitutional grounds was harmless. *See supra* at 13-14. Accordingly, it cannot be said that any error by the trial court in excluding the evidence and violating Petitioner's right to present a defense had a prejudicial effect. Petitioner's claim is without merit.

3.   Insufficient Evidence

Petitioner next claims that there was insufficient evidence to support his conviction for kidnapping to commit rape in violation of his right to due process. Petitioner claims that California law "does not permit the prosecution to substitute mental impairment for the elements of force/lack of consent." (Pet., Ex. C at 76-77.) In other words, Petitioner claims that there was insufficient evidence of force as required by state law. He also claims that there was no evidence that S. was sufficiently mentally impaired such that she lacked the capacity to consent.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the

1    evidence in support of his state conviction cannot be fairly characterized as sufficient to have led

2    a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional

3    claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to

4    federal habeas relief, *see id.* at 324.

5        The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal

6    habeas proceedings . . ." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam)

7    (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to

8    apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to

9    find that the evidence was insufficient to support petitioner's conviction).  A federal court

10    reviewing collaterally a state court conviction does not determine whether it is satisfied that the

11    evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th

12    Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see, e.g., Coleman*, 132 S. Ct. at 2064 ("the only

13    question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall

14    below the threshold of bare rationality").  The federal court "determines only whether, 'after

15    viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

16    could have found the essential elements of the crime beyond a reasonable doubt.'"  *Payne*, 982

17    F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found

18    proof of guilt beyond a reasonable doubt, has there been a due process violation.  *Jackson*, 443

19    U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir.),

20    *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048, *and cert. denied*, 475 U.S.

21    1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

22        The Court of Appeal rejected Petitioner's insufficient evidence claim based on its

23    interpretation of state law.

24             Defendant also challenges the sufficiency of the evidence to support his
            conviction on the ground that there was insufficient evidence to show that S.

25           was "mentally impaired" when she was taken and carried away by defendant.
            The jury was instructed that an intoxicated person could be a person with a

26           mental impairment, and there was substantial evidence that S. was incapacitated
            and mentally impaired when defendant placed her in his car and drove away

27           with her. We therefore reject defendant's challenge to the sufficiency of the
            evidence.

28

> We hold that Penal Code section 209, subdivision (b)(1) is violated when a defendant takes and carries away an incapacitated person to commit rape even if the defendant uses only the force necessary to accomplish such a taking and carrying away.

(Op. at 37.)

Respondent argues that Petitioner's challenge regarding insufficient evidence of force is in essence a claim that the state court misinterpreted state law, which is not cognizable on federal habeas review.  (Ans. at 20.)  A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). Furthermore, the *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16.  A federal court may, however, re-examine a state court's interpretation of its law if that interpretation appears to be an obvious subterfuge to evade consideration of a federal issue. *Mullaney v. Wilbur*, 421 U.S. 684, 691 n.11 (1975).  There is no indication of subterfuge here. Accordingly, this Court is bound by the state appellate court's determinations regarding Penal Code § 209(b)(1), *i.e.*, it is violated "even if the defendant uses only the force necessary to accomplish such a taking and carrying away." (Op. at 37.)  Petitioner's claim that the state court misinterpreted its own law is not cognizable.

The state appellate court also rejected Petitioner's second challenge that there was no evidence that S. was sufficiently mentally impaired such that she lacked the capacity to consent.

> S. testified that, at the point in time when defendant made contact with her in the alley, she was lying face down, slipping in and out of consciousness, and unable to move or talk. She had no recollection of how she came to be in defendant's car. A rational jury could have readily concluded that S. was incapacitated and that her state of off-and-on unconsciousness coupled with her inability to move or talk was indicative of a mental impairment that precluded her giving consent at the time that defendant placed her in his car and drove away with her.

(Op. at 37.)

Petitioner's claim is without merit.  S. testified that after she exited Fanny & Alexander's, she ran into an alley across the street and lost consciousness.  *See supra* at 2.  The

---

next thing she remembered was waking up to find herself lying on the ground in the alley. *Id.*
She recalled hearing her cell phone ringing several times, but was unable to answer. *Id.* When
Petitioner asked her if she was "okay," S. did not respond. *Id.* at 3. S. continued to throw up,
and "then somehow... ended up in [Petitioner's] car." *Id.* S. had no recollection as to how she
got in the car, and she did not agree to get in the car. *Id.* Viewing this evidence in the light most
favorable to the prosecution, the Court finds that any rational trier of fact could have found that
there was sufficient evidence of S.'s mental impairment. *Payne*, 982 F.2d at 338. The California
Court of Appeal's rejection of this claim was not based on an unreasonable determination of the
facts in light of the evidence presented at trial. 28 U.S.C. § 2254(d)(2).

### 4. Instructional Error

Petitioner's final claim is that the jury instruction on kidnapping did not comport with
due process because the given instruction exceeded the scope of the statute. Specifically, he
claims that the trial court erred in giving an instruction that included intoxicated and unconscious
persons within the definition of mentally impaired person because it "relax[ed]" the force
requirement. Pet. at 6, Ex. C at 59.

The Court of Appeal summarized what happened at trial with respect to this claim.

> At the instruction conference, defendant's trial counsel objected to the
> modified version of CALCRIM 1201 that the prosecutor asked the court to give.
> She objected to the language: "A person with a mental impairment includes an
> unconscious or intoxicated adult." The court suggested replacing "includes"
> with "may include." In the course of the discussion, the court asked: "There is
> no crime of kidnapping of intoxicated person?" Defendant's trial counsel
> responded: "No, there is not, but this [instruction] is making a crime." She noted
> that "there is no case out there that is published that says an intoxicated person
> is mentally impaired." The court decided to give the modified version of
> CALCRIM 1201 but replaced "includes" with "may include." The defendant
> requested, and the court agreed to give, an instruction on defendant' reasonable
> good faith belief in consent.
>
> The court gave the following instructions to the jury: "The defendant is
> charged in Count 1 with the crime of kidnapping a person with a mental
> impairment who was not capable of giving legal consent to the movement for
> purpose of rape. To prove the defendant is guilty of this crime, the People must
> prove that: One, the defendant intended to commit rape; two, acting with that
> intent, the defendant used enough physical force to take and carry away an
> unresisting person with a mental impairment; three, acting with that intent, the
> defendant moved the person with a mental impairment a substantial distance;
> four, the person was moved or made to move a distance beyond that merely
> incidental to the commission of a rape; five, the person suffered from a mental

impairment that made her incapable of giving legal consent to the movement; and six, the defendant did not actually and reasonably believe that the other person consented to the movement. [¶] A person with a mental impairment may include unconscious or intoxicated adults incapable of giving legal consent. The person is incapable of giving legal consent if he or she is unable to understand the act, its nature, and possible consequences."

"The defendant is not guilty of kidnapping if he reasonably and actually believed that the other person consented to the movement. The People have the burden of proving beyond a reasonable doubt that the defendant did not reasonably and actually believe that the other person consented to the movement." "When one consents to accompany another, there is no kidnapping, so long as the condition of consent exists. To consent, a person must: One, act freely and voluntarily and not under the influence of threats, force, or duress; two, have knowledge she was being physically moved; and three, possess sufficient mental capacity to make an intelligent choice whether to be physically moved by the other person. [¶] Being passive does not amount to consent. Consent requires a free will and positive cooperation in act or attitude."

(Op. at 25-26.)

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). *See, e.g., Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law, not element of crime for jury determination, not open to challenge on federal habeas review); *Walker v. Endell*, 850 F.2d 470, 475-76 (9th Cir. 1987) (failure to define recklessness was at most error of state law where recklessness was relevant to negate duress defense and the government was not required to bear burden of proof regarding duress). Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner will be entitled to habeas corpus relief from a state court conviction because of such inadequacy. *See Duckett v. Godinez*, 67 F.3d 734, 744 (9th Cir. 1995) (citing *Estelle*, 502 U.S. at 71-72).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must

be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502

U.S. at 72.

The California Court of Appeal stated the relevant state statutes for this claim:

> "Any person who kidnaps or carries away any individual to commit... rape... shall be punished by imprisonment in the state prison for life with the possibility of parole." (Pen. Code, § 209, subd. (b)(1).)  "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (Pen. Code, § 207, subd. (a).)

(Op. at 28.)

In considering Petitioner's claim, the state appellate court discussed at length state case

law which interpreted the force requirement under § 207, subd. (a), starting with the seminal case

of *People v. Oliver*, 55 Cal.2d 761 (1961), which held that moving someone against his will

when he is incapable of giving consent, without more, constitutes kidnapping under § 207 and

that a defendant's purpose in taking or carrying away the person may be dispositive.  (*See* Op. at

28-30.)  The state court then discussed subsequent appellate cases interpreting *Oliver* as relaxing

the force requirement in situations where the victim was a child.  (*See* Op. at 30-31, citing

*Parnell v. Superior Court*, 119 Cal.App.3d 392, 402, fn. 3 (1981), and *People v. Rios*, 177

Cal.App.3d 445 (1981).)  Two subsequent state supreme court cases seemed to suggest that

*Oliver* had "relaxed the force requirement" in cases involving minors who by reason of youth or

mental incapacity can neither give nor withhold consent.  (*Id.* at 31-34, citing *People v. Hill*, 23

Cal.4th 853, 857 (2000), and *In re Michele D.*, 29 Cal.4th 600 (2002).)

The state appellate court ultimately rejected Petitioner's claim, finding that the jury

instruction was consistent with state kidnapping law.

> Defendant contends that we cannot extend *Michele's* holding to an incapacitated adult. He argues: "[C]ourts are not free to engage in policy-based, ad hoc expansions of statutory provisions. The only way that the kidnapping statute can be extended to reach the substantial movement of voluntarily unconscious or intoxicated individuals is through a determination by a court that the Legislature intended to proscribe such conduct in Penal Code section 209." Defendant maintains that the Legislature did not so intend. [footnote omitted.]
>
> Defendant's argument implicitly concedes that Penal Code section 209, subdivision (b)(1) may be extended to cover the taking and asportation of an

incapacitated person if *a court* determines that the Legislature intended the statute to proscribe such conduct. Indeed, the California Supreme Court extended Penal Code section 207 in *Michele* to cover the taking and asportation of an infant because it concluded that the Legislature had intended for the statute to proscribe such conduct. "Our duty is to construe the statue in a manner that avoids the absurd consequence of allowing a defendant who carries off an infant or small child under circumstances similar to those in the present case to escape liability." (*Michele*, *supra*, 29 Cal.4th at p. 613.) An interpretation of Penal Code section 209, subdivision (b)(1) to avoid the absurd consequence of allowing a defendant to escape liability for carrying off an incapacitated person for the purpose of rape serves the legislative purpose underlying the statute, just as the California Supreme Court's construction of Penal Code section 207 did in *Michele*.

Indeed, under the rationale of *Michele*, it [is] our "duty" to construe Penal Code section 209, subdivision (b)(1) to proscribe the kidnapping for rape of an incapacitated person, as to find otherwise would be absurd. Our construction of Penal Code section 209, subdivision (b)(1) relaxes but does not eliminate the force requirement. "[O]rdinarily the force element in section 207 requires *something more* than the quantum of physical force necessary to effect movement of the victim from one location to another." (*Michele*, *supra*, 29 Cal.4th at p. 606, italics added.) Since an incapacitated person, like an infant, has no ability to resist being taken and carried away, the "something more" that is "ordinarily" required is not necessary, and "the amount of force required to kidnap an [incapacitated person] is simply the amount of physical force required to take and carry the [incapacitated person] away... with an illegal intent." (*Michele*, at p. 610.) When a perpetrator uses the force necessary to take and carry away an incapacitated person to commit rape, the perpetrator uses the amount of force required by Penal Code section 209, subdivision (b)(1).

(Op. at 34-37.)

As discussed in Petitioner's previous claim, this Court is bound by a state court's interpretation of state law. *See supra* at 18, citing *Bradshaw*, 546 U.S. at 76; *Hicks*, 485 U.S. at 629. Unless the state court is engaging in obvious subterfuge to evade consideration of a federal issue, this Court cannot re-examine a state court's interpretation of its law. *Mullaney*, 421 U.S. at 691 n.11. Here, the state appellate court conducted an extensive review of state precedent in determining that the force requirement of § 209, subd. (b)(1) was indeed "relaxed" but not eliminated because it was the Legislature's intent to protect victims such as S. – "an adult person, who by reason of extreme intoxication... is unable to give [her] consent." *Oliver*, 55 Cal.2d at 765. Because the given jury instructions were consistent with state law as determined by the state courts, there was no error. The state court's rejection of this claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor was it

1    based on an unreasonable determination of the facts in light of the evidence presented.  28

2    U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on this claim.

3    ///

4    ///

5

6                                    **CONCLUSION**

7            For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

8            The federal rules governing habeas cases brought by state prisoners require a district

9    court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its

10   ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  Petitioner has

11   not shown "that jurists of reason would find it debatable whether the petition states a valid claim

12   of the denial of a constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

13   Accordingly, a COA is DENIED.

14           The Clerk shall close the file.

15           IT IS SO ORDERED.

16   DATED:  ___9/25/12_____

17                                              LUCY H. KOH
                                                United States District Judge

18

19

20

21

22

23

24

25

26

27

28